## TRACTENBERG v. UNITED STATES.

(Court of Appeals of District of Columbia. Submitted October 2, 1923.  Decided November 5, 1923.)

No. 3970.

1. **Larceny ⏆68(3)—Evidence authorized submission of case to jury.**

In a prosecution for theft, evidence that, on the day after an automobile worth $2,500 was stolen, it was in defendant's possession, and on the following day defendant appeared in a city 100 miles away, turned the car over to another as security for a loan of $500, and that defendant admitted that he knew the car was stolen, *held* to authorize submission of the case to the jury.

2. **Larceny ⏆64(1)—Possession of recently stolen property may warrant conviction.**

The unexplained exclusive possession of stolen property shortly after the commission of larceny may satisfy the jury and warrant a conviction.

3. **Criminal law ⏆986—Prior conviction considered in imposing sentence.**

When defendant was brought to the bar to be sentenced for stealing an automobile, it was proper to present to the court a record of defendant's conviction for stealing another automobile in Philadelphia.

Appeal from the Supreme Court of the District of Columbia.

Aaron Tractenberg was convicted of theft, and he appeals.  Affirmed.

T. Morris Wampler, of Washington, D. C., for appellant.

Peyton Gordon, of Washington, D. C., for the United States.

Before SMYTH, Chief Justice, ROBB, Associate Justice, and BAILEY, Justice of the Supreme Court of the District of Columbia.

ROBB, Associate Justice.  Appeal from a judgment upon a verdict in the Supreme Court of the District finding appellant guilty of the theft of a Cadillac automobile (engine No. 57R), of the value of $2,500.

The evidence introduced by the government was substantially as follows:  At about 6 o'clock on the evening of January 14, 1922, a Mr. William F. Burrows parked his Cadillac automobile (No. 57R152) near Center Market in this District.  A few minutes thereafter he returned and found that his car had disappeared.  He next saw the car several weeks later at the District Building, in the hands of the police. It then had different license tags.

A Mr. Elam S. Fitts, who conducted a garage at Petersburg, Va., testified that on January 16, 1922, he loaned appellant, hereinafter referred to as the defendant, $500 on this automobile, defendant giving him a note for that amount and a bill of sale for the automobile; the understanding being that if, at maturity of the note, defendant was unable to pay in full, "it would be all right, so long as the car was left in the possession of the witness."  Mr. Fitts held the car about 30 days, when it was taken away by a member of the police force of Washington.  The testimony of another witness, a Mr. Carrigan, was to the same effect.  It was indicated, by the testimony of these two witnesses, that Fitts was authorized to use the car from the time it was turned over to him.

⏆For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The police officer, who brought the car from Petersburg to Washington, testified, and an officer by the name of Jett also took the stand; the latter's testimony being that, the morning after defendant was arrested, he—

"told the witness that he had negotiated to borrow some money on the car in Petersburg; the defendant did not say where he had gotten the car."

Officer Connors, of the Washington police, testified that he arrested defendant and talked with him about this Cadillac car. He asked defendant if he had taken it, and defendant denied doing so; that defendant—

"said that he had made a deal with Mr. Fitts in Petersburg about borrowing money on the car. He said he knew it was a stolen car. Witness spoke to him about finding the plates in the sewer at Tenth and K streets N. W. The defendant did not affirm nor deny that he put them in there."

The government rested, and no motion was made for a directed verdict.

On behalf of defendant, his sister testified:

That she accompanied him on a trip to Philadelphia early in January of 1922; that her brother wanted to purchase a secondhand automobile, and, with that object in view, visited a number of places where such cars were sold; that, when in the Broadway Auto Exchange, a man who gave his name as Myers approached them and—"asked her brother if he was interested in cars, and the brother told him that he was interested in a secondhand Cadillac and wanted to buy one. * * * The man went into detail and told the defendant that he had a Cadillac car, 1918 model, 57R"; that the car then was in a shop being overhauled; that her brother told the man that, if the car was in good condition and he would bring it down to Washington, defendant would buy it. The man wanted $1,500 for the car. Her brother gave him his Washington address, and told him that if the car, when brought to Washington, was what he said it was, defendant would give $1,500 for it. On Sunday morning January 15th, Myers appeared with the car, and her brother after trying it out said he had concluded to purchase it. Myers made out a bill of sale, and defendant went over to the house, about a block away, got the $1,500, and handed it to Myers who went away. On cross-examination, witness said her brother took a receipt for the $1,500; that she did not see the receipt afterwards, nor did she see Myers thereafter; that "on day of transaction he gave them his name and address on a slip of paper; does not remember the address now. Last time witness saw the slip of paper was on day of sale."

A brother testified to having been present when Myers appeared in Washington and heard him say he had brought the car they had talked about. Witness was present when the defendant gave money to Myers, and saw Myers do some writing and give defendant a paper. He had never seen Myers before.

The defendant testified substantially as did his sister concerning the Philadelphia trip, and his testimony as to the alleged Sunday morning transaction in Washington did not differ materially from that of his sister, except that while on the stand he produced the alleged bill of sale from Myers, covering "one Cadillac touring car, motor No. 57R152." He further testified that the next day he drove the car to Petersburg, Va., and borrowed the $500 on the car from Fitts, as

testified to by the latter. He denied that he either stole the car or knew it had been stolen. On cross-examination, he testified:

That "the receipt that was given for the money paid for the car got lost somewhere around the house"; that when the officers arrested him, and asked where he got the car, he told them he had bought it, but did not tell them where he bought it, and they did not ask him that question; that "after getting the car on Sunday he left Washington the next morning and drove to Petersburg; * * * that he made up his mind to apply to Fitts for the loan of $500 after he arrived in Petersburg; he knew Fitts would take care of the car; that after he bought the car from Myers he changed the tags that night and put on a set of Virginia tags. The old tags he thinks he left in the store; they were Pennsylvania tags."

At the close of all the evidence the defendant moved the court to direct a verdict of not guilty. This motion was denied, and various prayers were submitted to the court, all but one of which were denied and exceptions noted.

[1] The first assignment of error is based upon the motion for a directed verdict. That this car was stolen on the evening of January 14th, in the District of Columbia, is not questioned. Neither is it denied that on the next morning it was in the possession of defendant. It was established by the evidence for the government and admitted by the defendant that on the day following—that is, on Monday, or January 16th—the defendant appeared in Petersburg, more than 100 miles distant, and for an alleged loan of $500, on a car worth $2,500, and for which defendant says he paid $1,500 the day previous, defendant turned the car over to Fitts, giving him an absolute bill of sale, but with a parol understanding of an indefinite character that the car would be redelivered to defendant upon payment of the alleged loan. The evidence for the government also tended to show that, when arrested, the defendant admitted he knew it was a stolen car.

Evidently realizing that the evidence for the government made a case for the jury, defendant introduced evidence in his own behalf. The man Myers was neither definitely located nor produced. It is unnecessary to review in detail the evidence for defendant. On its face it was highly improbable and full of inconsistencies. While it might have satisfied the jury, the court certainly would not have been warranted, at the close of the case, in directing a verdict. The possession of this stolen automobile by the defendant, almost immediately following the theft, was an evidential fact tending to establish his guilt, and the court submitted that to the jury in connection with all the other facts and circumstances disclosed by the evidence.

[2] The jury were properly instructed that they might infer guilt from that circumstance, not that they should so infer. While such a circumstance does not raise a presumption of law that the defendant committed the alleged larceny (Sanders v. State, 167 Ala. 85, 52 South. 417, 28 L. R. A. (N. S.) 536; Williams v. State, 40 Fla. 480, 25 South. 143, 74 Am. St. Rep. 154), the unexplained exclusive possession of stolen property, shortly after the commission of a larceny, may satisfy the jury and warrant a verdict of guilty (Huggins v. People, 135 Ill. 243, 25 N. E. 1002, 25 Am. St. Rep. 357; Mason v. State, 171 Ind. 78, 85 N. E. 776, 16 Ann. Cas. 122; State v. White, 76 Kan. 654, 92

Pac. 829, 14 L. R. A. [N. S.] 556; State v. Weston, 9 Conn. 527, 25 Am. Dec. 46). There is some analogy between such a situation and res ipsa loquitur, where the facts of the occurrence warrant but do not compel an inference of negligence. As the court said in Sweeney v. Erving, 228 U. S. 233, 240, 33 Sup. Ct. 416, 418 (57 L. Ed. 815, Ann. Cas. 1914D, 905):

"They [such facts] furnish circumstantial evidence of negligence, where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. 'Res ipsa loquitur,' where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is whether the preponderance is with the plaintiff."

So here the possession of the stolen automobile did not shift the burden of proof. Had no evidence been introduced by the defendant, it still would have been within the province of the jury to have acquitted him, as it would have been within their province to convict him. Defendant having introduced evidence in his own behalf, it was for the jury to say, in view of all the facts and circumstances disclosed by the evidence, whether he was guilty as charged, and so the court in effect told the jury in the concluding paragraph of the charge, as follows:

"Now, all that evidence is to be considered and weighed by you in determining whether or not, first, the car that was stolen was Burrows' property. Was it stolen? Was it in the possession of Trachtenberg, the defendant here, the very next morning after it was stolen? And, if so, was he the thief, or is his explanation of how he came to be in possession of that car on Sunday morning one that is reasonable and satisfied you? If it is, no matter what there might be of suspicion and distrust, you will acquit him. If you are not satisfied with the reasonableness of the explanation, then you come back to the question whether or not you will indulge in the presumption that the law says you may indulge in in the case—that, being in the possession of recently stolen property, it is fair to assume that he is the thief."

While the court used the term "presumption," the jury had been very carefully instructed that it was for them to say whether they would infer guilt from the fact of possession, under the circumstances disclosed, so that "presumption" was here used, and must have been understood by the jury, in the sense of an inference that might or might not be indulged. Immediately following this, the court instructed the jury that the defendant was presumed to be innocent, and that the burden of proof was upon the government to establish his guilt beyond a reasonable doubt. The court then read to the jury defendant's prayer No. 5, as follows:

"If they [the jury] believe the explanation of the possession of the automobile by the defendant to be reasonable and probably true, they shall find a verdict of acquittal."

Since the charge of the court contained a full and correct statement of the law applicable to the case, it was not error to refuse the various prayers for instruction, which need not be repeated here.

[3] One point remains. When defendant was brought to the bar for sentence, the government, over the objection of the defendant, presented to the court the record of defendant's conviction for stealing an automobile in Philadelphia. It is here insisted that this constituted prejudicial error, under the ruling of the court in Raymond v. U. S., 25 App. D. C. 555. There Raymond had been convicted on a charge of criminal libel, and one of the important issues at the trial was whether he had signed a receipt for a special delivery letter. There was testimony that his wife had signed it. When he was brought before the court for sentence, the government in effect was permitted to reopen the case and produce the receipt, which was in Raymond's handwriting. The difference between that case and the present is obvious. There the court in effect retried an issue of fact that was for the jury alone. Here the court did no more than inform itself as to the previous record of the defendant, not for the purpose of retrying any issue before the jury, but for the purpose of performing one of its own functions, namely, the imposition of sentence. No citation of authorities is required to justify the exercise of such discretion by the trial court.

The judgment must be affirmed.

Affirmed.

BAILEY, Acting Associate Justice, concurs.

Mr. Justice BAILEY, of the Supreme Court of the District of Columbia, sat in the place of Mr. Justice VAN ORSDEL in the hearing and determination of this appeal.